UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-CR-00274 (RDM)** |
| v. | : | |
| | : | |
| JOHNNY HARRIS, | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Johnny Harris to 12 months' incarceration, the midpoint of the guideline range, followed by one year of supervised release, 60 hours of community service, and $500 in restitution.[1]

## I.    Introduction

Defendant Johnny Harris, a 58-year-old self-employed tradesman, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[2]

---

[1] The estimated guideline range agreed to by the parties and calculated by the United States Probation Office is 8 to 14 months' incarceration; however, the statutory maximum sentence for Harris's violation of 18 U.S.C. § 1752(a)(2) is one year of imprisonment, and therefore the effective guideline range is 8 to 12 months' incarceration. U.S.S.G. § 5G1(c)(1); PSR ¶ 151.

[2] Although the Statement of Offense in this matter, filed on October 21, 2022, (ECF No. 50 at ¶ 6) reflects a sum of more than $1.4 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol were $2,881,360.20. That amount

Harris pleaded guilty to Count Two of the Information, charging a violation of 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building. As explained herein, a sentence of 12 months' incarceration is appropriate in this case because Harris: (1) entered the restricted grounds on the West Front of the Capitol, moved near the front of the barricade line on the Lower West Terrace where he witnessed violence between other rioters and police officers, ascended the Southwest Staircase, and climbed on a viewing platform that had been erected for the inauguration ceremony; (2) from that vantage point, urged other rioters to "move forward"; (3) observed the breach of the Upper West Terrace Door and entered the Capitol building through that door shortly thereafter; (4) traveled to multiple locations inside the Capitol building, including the Old Supreme Court Chamber, the Rotunda, the Rotunda Door, and back to the Rotunda; (5) used a megaphone inside the Rotunda to start a call-and-response chant with other rioters, yelling "Whose house? Our house!"; (6) refused police officers' commands to leave the Rotunda, actively and passively resisted officers' efforts to clear rioters from that area, pushed an officer on one occasion, and stayed inside the Rotunda until he and other rioters were forced out; (7) bragged on social media about his participation in the attack on the Capitol, posting photos and videos during the riot and long after; and (8) told the FBI late in January, 2021, that if he had it all to do again, he would do it the same way.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions

reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

alongside so many others, the riot likely would have failed. Here, the facts of and circumstances of Harris' crime support a sentence of 12 months' incarceration.

## II.   Factual and Procedural Background

### a.   The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 50 (Statement of Offense), at ¶¶ 1-7.

### b.   Harris' Role in the January 6, 2021 Attack on the Capitol

Defendant Johnny Harris, who lives in Shelby, North Carolina, participated in the January 6 attack on the Capitol. His crimes are documented through a series of videos provided to the FBI by concerned citizens; videos and pictures seized from devices operated by other January 6 rioters; body worn camera (BWC) video recordings from the Metropolitan Police Department (MPD); open-source videos and pictures; surveillance footage (CCV) from the exterior and interior of the Capitol; videos and pictures provided by Harris (Exhibit A), per the terms of his plea agreement; his own statements to investigators; and comments, videos, and pictures posted by Harris on his Facebook account (Exhibit B). Harris was active on social media.

*Harris' Facebook Activity Preceding January 6*

On December 21, 2020, one of Harris' Facebook contacts posted an image to her Facebook page promoting an event called the "Million Maga March," which was scheduled to occur on January 6, 2021, in Washington, D.C., with the caption: "We Won This Election, This is Our Inauguration." Harris commented on the post: "We will be there 1776." Later that same day, Harris commented: "Here Comes The Boom! … We will be there to celebrate 4 more years of Our Great President: Donald J. Trump."  On December 23, 2021, Harris commented: "it will be war," and on January 2, 2021, Harris commented: "You cant [sic] stop us we will be there TRUMP or WAR."

*Harris' Activities on January 5*

Harris traveled to Washington, D.C., on January 5, 2021. Throughout his time in Washington, D.C., and at the U.S. Capitol, Harris used his cell phone and GoPro camera to record video and take pictures of the events.

On the night of January 5, Harris attended protests in downtown Washington, D.C. Harris was wearing a yellow shirt with the Gadsden flag and script: "Don't Tread on Me," camouflage cargo pants, black boots, and a knit trapper hat in American flag print, and he carried a silver knife in a belt holster, as shown in Image 1, as well as in Exhibit C (Timecode 22:21), Exhibit D (Timecode 02:33:27), and Exhibit E (Timecode 03:09). Harris traveled to around downtown, following a crowd that included members of the Proud Boys, livestreamers, and other protestors.



*Image 1, a screen shot from Exhibit E, Timecode 03:09 – Harris (circled in yellow) crossing police line, filming with cell phone, and carrying knife in belt holster (circled in red)*

That night, MPD officers formed lines to control the crowd and prevent protestors from entering certain restricted areas, including Black Lives Matter Plaza and Lafayette Square near the White House. As shown in Exhibit E, Timecode 03:03, Harris crossed the police line, and he was pushed back by an officer. Later that night, Harris was interviewed by Anthime Gionet, a livestreamer known as "Baked Alaska" who was present at the protest. Gionet asked Harris,

"What's your message today, sir? What do you got to say?" Harris replied, "Fuck Antifa!"[3] and yelled, "Trump or war! Trump or war!" (Exhibit D, Timecode 02:33:27.)

*Harris' Participation in the January 6 Attack on the Capitol*

On January 6, 2021, Harris attended the "Stop the Steal" rally. He was wearing a short sleeve button-down shirt in American flag print with a long sleeve white shirt underneath, camouflage pants, black boots, a neck gaiter in American flag print, and a knit cap in American flag print with the image of a bald eagle and script: "Trump, Keep America Great." At various times during the day, as further shown below, Harris wore the knit trapper hat in American flag print that he wore on January 5. Additionally, Harris carried a black megaphone decorated with stickers and several flags affixed to a shower curtain rod, including a standard American flag, an American flag with script: "1776, When Tyranny Becomes Law, Rebellion Becomes Duty," a blue flag with script: "Trump 2020, Keep America Great," and a black Gadsden flag with script: "Liberty or Death, Don't Tread on Me."

By approximately 9:32 a.m., Harris was at the rally on the National Mall near the Washington Monument. At approximately 11:00 a.m., Harris marched with members of the Proud Boys down the National Mall towards the Capitol, along First Street NW in front of the Capitol, and up Capitol Hill on Constitution Avenue.

At approximately 11:45 a.m., the group arrived at the East Plaza of the Capitol grounds. There, an unidentified individual gave instructions to the group to prepare to be photographed: "Proud Boys! Line up here, turn around." Harris lined up near the front of the group, holding his

---

[3] According to public reporting, Antifa is a left-wing anti-fascist political movement in the United States. As further detailed below, Harris repeatedly claimed, on Facebook and in an interview with the FBI, that the January 6 attack on the Capitol was a "false flag" operation staged by Antifa to implicate former President Trump and his supporters.

flag high. A Proud Boys member near Harris yelled: "We're gonna take the fuckin' Capitol."
Another member admonished that individual, "Let's not fuckin' yell that." Harris and members of
the Proud Boys were photographed (Image 2), as shown in Exhibit F (Timecode 32:18-32:53, and
34:00). Afterwards, Harris marched back down Capitol Hill with the group.

Harris later shared Image 2 on Facebook to describe his experience on January 6.



*Image 2, Exhibit B-14 – Harris with Proud Boys in front of the Capitol*

Sometime between approximately 1:08 p.m. and 1:40 p.m., Harris joined the crowd
and entered the restricted area of the Capitol grounds on the West Lawn. Harris remained there for
approximately one hour and took videos and pictures of the events.[4]

At approximately 2:30 p.m., police officers on the Lower West Terrace were overrun by
rioters and forced to retreat from the barricade line. Harris made his way near the front of the

---

[4] As shown in Exhibit A, Harris turned over videos and pictures from January 6 per the terms of
his plea agreement. The government notes that Harris did not provide any videos or pictures from
the protest on the night of January 5, on January 6 between 10:30 a.m. and 12:45 p.m. when Harris
marched with the Proud Boys, or on January 6 between 1:08 p.m. and 1:40 p.m. when Harris
entered the restricted area of the Capitol grounds. However, Harris explained to the FBI that his
GoPro camera was not recording on occasions when he thought he was filming, and he lost an SD
card containing files from his cell phone.

fighting, as shown in Image 3. There, Harris would have observed violence between rioters and police officers, including the deployment of tear gas and chemical irritant sprays.



*Image 3 – Harris (circled in yellow) near violence on the Lower West Terrace*

Between approximately 2:30 p.m. and 2:43 p.m., Harris traveled up the Southwest Staircase to the Upper West Terrace, as shown in Image 4.



*Image 4 – Harris ascending the Southwest Staircase*

When he reached the Upper West Terrace, Harris climbed on a viewing platform that had been erected for the Presidential inauguration ceremony.  Harris took pictures from the viewing platform, including Image 5, which he posted on Facebook in real time.



*Image 5, Exhibit B-2 – Picture of riot from viewing platform,*
*taken by Harris and posted on Facebook*

While Harris was making his way to the viewing platform, at approximately 2:33 p.m., the Upper West Terrace Door was opened from the inside by rioters exiting the Capitol building. Rioters who were outside the door then entered the building. However, at approximately 2:41 p.m., five USCP officers were able to temporarily resecure the breached door. Harris took pictures and videos of rioters amassed outside the Upper West Terrace Door, which he posted on Facebook in real time.

At approximately 2:44 p.m., USCP officers protecting the Upper West Terrace Door were significantly outnumbered by rioters and retreated from their position. At that time, Harris descended the viewing platform stairs, briefly stopping to film video of MPD police officers, as shown in Image 6, which he later posted on Facebook. He then walked through a flowerbed, jumped over metal fencing that had been knocked over by other rioters, and entered the Capitol

building through the Upper West Terrace Door at approximately 2:45 p.m., as recorded on the BWC of MPD Officer M.F. (Exhibit G, Timecode 14:44:56), and on Capitol CCV (Exhibit H, Timecode 2:45:41 PM, and Exhibit I, Timecode 2:45:46 PM).



*Image 6, screen shot from Exhibit A-37 – Video of MPD police officers, filmed by Harris and later posted on Facebook*



*Image 7, screen shot from Exhibit H – Capitol CCV showing Harris enter Capitol building*

Inside the Capitol building, Harris travelled up a staircase to the Rotunda and then to a hallway near the Old Supreme Court Chamber, as shown in Image 8. Together with others, Harris can be heard in Exhibit J (Timecode 14:51:19) attempting to persuade police officers to join the

rioters: "There's a million more of us behind us, okay… This is not against y'all… It's not about

y'all… This is your government done this to y'all too!"



*Image 8, screen shot from Exhibit J – BWC from MPD Officer A.M.,*
*showing Harris near Old Supreme Court Chamber*

Harris re-entered the Rotunda, as shown in Exhibit K (Timecode 2:56:35 PM). Harris then

travelled to the Rotunda Door, as shown in Image 9. There, he filmed rioters fighting with police

officers for control of the entrance. Harris later posted a picture that he took of rioters entering the

Capitol through the Rotunda Door on Facebook.



*Image 9, screen shot from Exhibit L – CCV showing Harris film rioters*
*entering at the Rotunda Door*

At approximately 3:02 p.m., reinforcement police officers began to enter the Rotunda from the north. A few minutes later, Harris returned to the Rotunda, as shown in Image 10.



*Image 10, screen shot from Exhibit M – CCV showing Harris (circled in yellow)*
*return to the Rotunda and reinforcement officers (circled in blue)*

Harris continued to take videos and pictures of the events, including video of a rioter directing others to Speaker of the House Nancy Pelosi's office, which Harris later posted on Facebook.

At approximately 3:06 p.m., police officers lined up in formation on the west side of the Rotunda and began to verbally and physically direct rioters to exit the building through the Rotunda Door. Around that same time, as shown in Image 11, Harris used a megaphone to start a call-and-response chant, yelling, "Whose house? Our house!"



*Image 11, still from Exhibit N, Timecode 1:06:02 – Harris in the Rotunda*
*starting a chant with his megaphone*

As shown in Exhibit N, Timecode 1:06:00 through 1:08:00, Harris was filmed and interviewed by a reporter affiliated with French news media. The reporter asked whether Harris was "trying to disturb the debate?" Harris initially responded "no" but then quickly changed his answer to: "Oh yeah, we're trying to upset their decision. We're trying to make them make the right decision. Donald Trump won this election. By far. We're not gonna let it be stolen from us." The reporter then asked if Harris intended to stay in the Capitol, to which Harris responded: "Until Donald Trump is the president, yes. Well, he is the president. Until he gets his reelection, we will be here. Siege of the White House—or the Capitol Building." Harris further claimed, "We're not here to hurt anybody… We're just here to let them know that there's a million of us—or more— out there that will come through this building if necessary." The reporter finally asked Harris what he was expecting, and he responded, "What should rightfully be done. Donald Trump is our president, and he will be re-elected and the rest of 'em will go to jail." At the end of the interview, police officers are shown in Exhibit N directing rioters to exit the Rotunda to the Rotunda Door Harris warned the reporter, "That's the police! Watch out! Here come the police!"

Between approximately 3:06 p.m. and 3:30 p.m., many rioters in the Rotunda, including Harris, refused to follow officers' commands to leave the area. As shown in Exhibit N (Timecode 1:08:00 through 1:09:00), Exhibit O (3:08 p.m. to 3:17 p.m.), Exhibit P (3:07 p.m. to 3:12 p.m.), and Exhibit Q (3:19 p.m. to 3:22 p.m.), Harris repeatedly moved to the front of police lines and refused commands from multiple officers.



*Image 12,[5] screen shot from Exhibit Q, 3:19 p.m. – BWC from MPD Officer D.N.,
showing officers with Harris in the Rotunda*

At one point in the commotion, as shown in Exhibit N, Harris appeared to have dropped

his cell phone. Harris then placed his hand on a police officer's chest and pushed that officer, while

reaching down to retrieve his phone, as shown in Image 13.



*Image 13, screens shot from Exhibit N, Timecode 1:08:18 – Harris pushes officer*

As caught on his own video recording (Exhibit A-54, Timecode 00:00 through 00:20),

Harris yelled at police officers: "Motherfuckers! Who you pushing on? I'm just getting my

---

[5] The government used Image 12 in its Statement of Facts supporting the criminal complaint. ECF
No. 1-1 at 4, unsealed on March 18, 2021. Harris then used Image 12 as his Facebook cover
photograph and shared it with multiple Facebook contacts, bragging about his experience on
January 6.

goddamn phone!" Referring to the officer who had pushed him back, Harris stated, "I'm gonna find that motherfucker!" An unidentified officer responded, "Please back up. Okay, please back up." Harris replied, "I told you I was getting my phone. What the fuck's wrong with y'all. We're peaceful man!" Harris then remained at the front of the police line and refused to exit the Rotunda.

Subsequently, an officer attempted to take Harris' flag away from him. Ultimately, the officer allowed Harris to keep the flag.

As shown in Exhibit Q (3:19 to 3:22 p.m.), Harris argued with a police officer that he only wanted to remain in the Rotunda to retrieve his personal belongings, including a megaphone, which Harris referred to as his "speaker horn."

At approximately 3:27 p.m., Harris was escorted out of the Rotunda by a police officer. The government estimates that Harris was one of the last rioters to be removed from the Rotunda, as shown in Image 14.



*Image 14, screen shot from Exhibit K – CCV showing Harris escorted by a police officer from the Rotunda*

At approximately 3:29 p.m., Harris exited the Capitol building through the Memorial Door, and he did not re-enter. Harris was inside the Capitol building for approximately 44 minutes. After exiting the Capitol, Harris remained on the East Front of the Capitol grounds, where he continued to take videos and pictures.

Harris then travelled back to the West Front of the Capitol grounds, where he was photographed in front of the Capitol, as shown in Image 15. Harris later posted Image 15 on Facebook to celebrate the one-year anniversary of January 6, bragging about his participation in the riot.



*Image 15 – Photograph of Harris in front of the Capitol,*
*later posted on Facebook*

*Facebook Activity Immediately Following January 6*

As detailed above, on January 6, Harris shared several pictures of the events on Facebook in real time. After exiting the Capitol building, at approximately 4:18 p.m., Harris posted a picture that he took of rioters inside of the Rotunda and commented: "Us is going on in there."

On the night of January 6, Harris bragged to a Facebook contact, "Gastonia was in the House," referring to a town near Harris' home. Later that night, Harris commented, "So giving up is the answer[?] Never. We just got started. Or would you rather be run over by these evil people. Even if we must give our lives to stop the awful takeover… We have allowed this to happen. No

one cares enough to make sacrifice. We will not go away… We will prevail. We will not give up…
It started today."

Also, on that same night, Harris began to spread misinformation about the attack on the
Capitol: "I saw it first hand [police officers] backed off and allowed everyone to walk right in…
They allowed it[,] I am sure… Door was wide open no one trying to stop anyone… It wasn't a
riot… A window was busted by antifa… It was a setup."

*Harris' First Interview with the FBI*

On January 20, 2021, Harris was interviewed by FBI agents in Gastonia, North Carolina.
Harris told agents that he did not have anything to hide and wanted to cooperate. Harris remarked
that he had considered turning himself in for having participated in the Capitol riot but decided to
wait for investigators to approach him instead.

 Harris informed agents that he liked to travel, attend large events, and "party." Harris said
he attended Woodstock twice and that he had attended an event in Nevada called "Storm Area 51,
They Can't Stop Us All" in September 2019. (According to public reporting, the purpose of the
event was for attendees to charge a restricted military base known as "Area 51" with overwhelming
force, breach the entrances of the base, and attempt to view extraterrestrial beings held at that
location.) Harris informed agents that he was drunk at the event and participated in an interview
with a reporter, and his interview subsequently went viral.[6]

Harris explained that he went to the Capitol on January 6 because former President Trump
said it was going to "be wild." Harris traveled to Washington, D.C. with two friends. On the
morning of January 6, Harris and one of his friends arrived at the National Mall around 8:00 a.m.

---

[66] "The Raid of Area 51," All Gas No Breaks, Timecode 04:56, https://www.youtube.com/
watch?v=YZDc3UNTeHs.

Harris did not see former President Trump speak because he noticed members of the Proud Boys and decided to follow the group.

Harris told agents that he saw people marching towards the Capitol, so he followed the crowd. When he got close, Harris saw tall scaffolding and thought it looked like a great vantage point to film. Harris heard an individual at the top of the scaffolding with a megaphone urging the crowd to "move closer." Agents asked whether Harris was also urging the crowd to advance. Harris confirmed that he could be heard on video telling others in the crowd to "move forward." Harris remarked, "I'm not asking for leniency. I did what I did for the country."

From the top of the bleachers, Harris turned to film the mob coming towards the Capitol from high ground. At that point in the interview, Harris remarked to the agents, "It was beautiful, so many patriots." When Harris turned back towards the Capitol, he saw police officers with shields. Harris told agents that he could be heard in his one of his videos saying, "Holy shit, we're in trouble." Harris then saw an open pair of doors and rioters entering the Capitol building. Harris claimed that, at that point on January 6, he did not know what was real or fake, what was allowed or prohibited, and he assumed he could enter. Harris also claimed that natural reaction was to follow the crowd and film the events.

Harris admitted that once inside, he used his megaphone to start a "Whose house? Our house!" chant. Harris traveled down a hallway until he encountered a group of police officers. Harris said that while he was facing the officers, he saw an unknown substance that looked like silly string fly over his shoulder and hit a police officer's face shield. Harris believed it was some kind of pepper spray. At the time, he thought to himself, "That was assault." Harris maintained that he was submissive to police officers. Harris claimed that he was just trying to film "the story of a lifetime."

Harris saw police officers who were trying to push rioters out of the Rotunda Door, but there were hundreds of people trying to enter the building at those same doors. Harris claimed that he was trying to exit, but he was pinned between officers pushing out and rioters pushing in.

Harris told agents that he observed other rioters fighting with police officers in the Rotunda. Harris recalled that, at some point, an officer attempted to confiscate his flag. Harris told the officer that it was just a flag, and he claimed the officer told him to promise not to use it as a weapon. Harris replied, "We love the police. What we're doing is for our country." Harris claimed that he left the Rotunda peacefully and gave officers fist bumps on his way out.[7]

Harris expressed embarrassment for having participated in the January 6 riot; however, he said that if he had it all to do again, he would do it the same way. Harris said that, even if it meant being charged, he believed what he had done was for the good of the country.

Harris told agents that he wanted to cooperate, and he offered to drive to an FBI field office in Rock Hill, South Carolina, on the follow day to deliver videos that he had filmed on January 6. However, following the interview, Harris changed his mind, decided not to cooperate with investigators, and did not provide the FBI with his videos at that time.

*Harris Spreads Misinformation on Facebook*

On March 17, 2021, Harris was charged by criminal complaint. ECF No. 1. On March 18, he was arrested. ECF No. 6. Between April 2021 and August 2022, Harris was active on Facebook, spreading misinformation about January 6, sharing videos and pictures that he had taken during

---

[7] BWC and CCV videos do not show that Harris was pinned by the crowd, stuck inside the Rotunda, or left peacefully. Instead, he refused to leave the area, even as police officers attempted to forcibly remove him. The government has not located any evidence corroborating Harris' account of giving fist bumps to officers.

the riot, and attempting to contact public figures about his experience, as shown in Exhibit B.

A non-exhaustive list includes the following:

> On April 26, 2021, Harris sent a Facebook message to Mike Lindell, an American businessman and prominent supporter of former President Trump. Harris wrote: "Hello Mr. Lindell, Hope you are well… I have film of importance from Jan. 6. I was there filming. Also have been charged with a few misdemeanors. I did nothing wrong, and I am not worried about my charges, I need my film to get to the right people. It is Very Important. I can drive it to any destination."

> On June 26, 2021, Harris exchanged messages with a Facebook contact: "You will see. The election was a fraud, truth coming out daily. I always had balls, it's not as bad as you think for me. I done nothing wrong, I didn't go there to fight."

> On July 3, 2021, Harris commented: "I like me some Extremist peoples."

> On August 22, 2021, Harris commented: "No, [January 6] was orchestrated by Antifa, BLM, Capitol Police, and Nancy Pelosi."

> On October 21, 2021, Harris commented: "The democrats were paying antifa to start the events on jan6. Demand all film. There's a reason they don't want to release it… not a theory the truth. You will see if and when they release the film."

> On November 3, 2021, Harris commented on Representative Marjorie Taylor Greene's live video: "Antifa was at the Capitol on Jan 6. They were inside directing traffic and instigating things. Demand to see all film."

> On January 7, 2022, as referenced above, Harris posted Image 15 on Facebook with the caption: "A year ago today I got home from my 1st Donald Trump Rally, And what a rally it was! I eagerly posted film of it here on space book and wound up on the FBIs list of coolest looking, best dressed Crime fighters, (alias) Captain nobody, that's because I was the 420th arrest in the totally setup INSURFUCKIGRECTION! So without further ado, If I get 100 likes on my Picture I will post more film that should more than likely get me locked up again. This is a picture after the mostly peaceful protest, tear gas still on my face. Be sure to see my other post, I will be uploading next few days. Lots to see. Let's go brandon!" Later that day, Harris shared a video on Facebook that he filmed on January 6.

> On January 8, 2022, Harris shared another video that he had filmed on January 6, Exhibit B-16, with the caption: "Here are the soy boys, Antifa Directing Traffic, just like AGENT EPPS. You can hear 2 voices in unison 1st time, FIND the guy in black, I have studied him, he is the one that has answers he's friends with John Sullivan. He waits on John to catch up to him in the Ashli Babbitt Video he filmed. These guys are on a mission, an agenda. He came in alone and met up with others. They are in other videos on youtube from Washington post Lots of ANTIFA/ BLM in TRUMP wear as well as Plain Black dark glasses, grey toboggans hoodies, and blue face mask, 2400 people entered the CAPITOL only 725 Charged? How many were ANTIFA, BLM, and other provocateur Agents, that are not being charged? Are these guys charged? I cant find them yet ... I need your help Share this far and wide, more to come."

Between January 9 and April 7, 2022, Harris exchanged dozens of messages with a Facebook contact, spreading misinformation about January 6 and sharing pictures of rioters who Harris suspected were agent provocateurs.

On January 10, 2022, Harris changed his Facebook cover photograph to Image 12, a screen shot that the government had been included in the Statement of Facts attached to the Complaint, ECF No. 1-1 at 4 (unsealed on March 18, 2021), which showed Harris on BWC refusing the leave the Rotunda.

Between January 11 and May 13, 2022, Harris exchanged Facebook messages with David Sumrall, who runs a website advocating and fundraising for January 6 defendants. Harris informed Sumrall that Alexandra Pelosi, a documentary filmmaker and daughter of former Speaker Nancy Pelosi, was interviewing Harris for a documentary. Harris also shared news articles, websites, and pictures that Harris had taken on January 6.

On February 10, 2022, Harris commented: "Try to hang on people. Trump is in control. I suggest everyone pray and be involved, it's about We The People taking our country back." Later that same day, Harris exchanged messages with a Facebook contact: "We are at war with Good versus evil. We must stand united even if it hurts."

Between July 7 and July 28, 2022, Harris exchanged messages with a Facebook contact, sharing pictures he had taken, bragging about participating in the January 6 riot, and spreading misinformation about agent provocateurs.

*Harris' Second Interview with the FBI*

On February 22, 2023, Harris pleaded guilty to Count Two of the Information, charging one count of violating 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building. ECF No. 49. On April 7, 2023, Harris was interviewed by FBI agents again, and he largely corroborated the account given during his first interview.

Harris acknowledged that his reaction to police officers attempting to take his flag away while inside the Rotunda was not a rational reaction given the situation faced by law enforcement on January 6. When asked about specific interactions with police officers and whether he was resisting officers, Harris replied, "Somewhat." Harris acknowledged that on multiple instances he did not listen to officers while inside the Rotunda. Harris also acknowledged that his actions likely aided others inside the Capitol who were engaged in more serious criminal activity.

Agents asked Harris about his claim that a group of agent provocateurs associated with Antifa were responsible for the January 6 attack on the Capitol. Harris claimed that he could assess

whether certain rioters were Antifa members based on research he had done about how Antifa members dressed. Harris suspected Ray Epps was an agent provocateur. Harris recognized a rioter who he had filmed in the Rotunda in public reporting and drew the conclusion that the rioter was "directing traffic like Epps," or otherwise acting as an Antifa agitator. Harris then admitted that he had no other proof any of the many rioters he had identified were Antifa members.

When asked if there was any other information of value to the FBI regarding January 6, Harris directed agents to videos that he had seen posted online that Harris thought showed suspicious behavior by rioters and police officers. An FBI agent remarked that even two years after the January 6 riot, it sounded like Harris was uncertain of what truly happened at the Capitol. Harris replied, "I'm still a little confused about what I've seen on some of the clips of film. I think they need to be looked into… It's all on Rumble, you just got to put 'Antifa at the Capitol,' search it like that." Harris maintained that the 2020 Presidential election was fraudulent.

*The Charges and Plea Agreement*

On March 13, 2021, Harris was charged by Complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 14, 2021, Harris was arrested in Shelby, North Carolina. On April 2, 2021, Harris was charged by Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On February 22, 2023, Harris pleaded guilty to Count Two of the Information charging a violation of 18 U.S.C. § 1752(a)(2). Under the plea agreement, Harris agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Harris now faces sentencing on one count of violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement, he faces up to one year of imprisonment and a fine of up to $100,000. He must

also pay $500 in restitution under the terms of the plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. The U.S. Probation Office calculated Harris' adjusted offense level as follows:

Count Two: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Specific Offense Characteristic: *Physical Contact with Officer* | +3 |
| **Adjusted Offense Level Subtotal:** | | **13** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-2</u> |
| **Total Offense Level**: | | **11** |

*See* PSR at ¶¶ 32-40.

The U.S. Probation Office calculated Harris' criminal history as a category of I. PSR at ¶ 61. Accordingly, with an offense level of 11 and a criminal history category of I, the resulting guidelines imprisonment range is 8 to 14 months. PSR at ¶¶ 151. However, the statutorily authorized maximum sentence of one year is less than the maximum of the guideline range;

therefore, the guideline range is 8 to 12 months. *Id.* Harris' plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

While the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence of 12 months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

### A.    The Nature and Circumstances of the Offense

"The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Harris' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

The nature and circumstances of Harris' crimes weigh heavily towards a term of incarceration. Harris' statements and actions prior to the riot demonstrate that he was prepared for violence and prepared to challenge law enforcement. On December 23, 2021, Harris commented on Facebook: "it will be war." On January 2, Harris commented on Facebook: "You cant [sic] stop us we will be there TRUMP or WAR." On January 5, the night before the riot, Harris paraded through downtown Washington, D.C., openly carrying a knife on his belt. Harris was recorded by a livestreamer at the front of a police line, yelling, "Trump or war! Trump or war!" Later that night, Harris crossed a police line and was physically forced back. Certainly, Harris' activities on January 5 were a preview what he would do on January 6.

On January 6, Harris chose to place himself near the center of the action at every opportunity presented. From approximately 11:00 a.m. to 12:00 p.m., Harris joined with members of the Proud Boys to march in a show of force from the National Mall to the top of Capitol Hill. Harris posed with Proud Boys members for photographs on the East Front of the Capitol grounds. After an unidentified individual gave instructions to the group to prepare to be photographed: "Proud Boys! Line up here, turn around," Harris lined up near the front of the group, holding his flag high. A Proud Boys member near Harris yelled: "We're gonna take the fuckin' Capitol." Another member admonished that individual, "Let's not fuckin' yell that." Harris and members of the Proud Boys were photographed. Afterwards, Harris marched back down Capitol Hill with the group, carrying his flag in solidarity with the parade. Harris was eager to follow and take directions from Proud Boys members, in stark contrast to his refusal to obey police commands in the Rotunda.

Harris chose to enter the restricted area of the Capitol grounds on the West Lawn. Harris was not one to wait near the back of the crowd, so he moved very near the front of the fighting at the Lower West Terrace. Once police officers were overwhelmed by rioters and force to retreat,

Harris took full advantage and ascended the Southwest Staircase to the Upper West Terrace. Harris climbed on a viewing platform that had been erected for the inauguration ceremony, witnessing from a high vantage point the scope of the chaos around him and sharing pictures of the scene in real time on Facebook. Harris urged other rioters with his megaphone, yelling, "Move forward!" Below Harris on the Lower West Terrace, rioters were engaged in physical violence and property destruction; police had deployed tear gas, and smoke enveloped the mob; and there was deafening use of sound amplification, yelling, and chants. When asked by FBI agents what he saw from the platform, Harris called it "beautiful."

As discussed above, USCP officers guarding the Upper West Terrace Door were overwhelmed and retreated from the entryway. Harris witnessed their retreat from the viewing platform. As soon as USCP officers pulled back, dozens of rioters, including Harris at 2:45 p.m., entered the Capitol through that door while piercing alarms were sounding. By approximately 2:46 p.m., MPD officers resecured the Upper West Terrace Door again. Harris took advantage of a very narrow window of time when police officers were overwhelmed to enter the Capitol building.

Once inside, Harris started a "Whose House? Our House!" chant with his megaphone. Harris witnessed a police officer assaulted with a substance that Harris believed to be pepper spray, yet he remained in the Capitol. In the Rotunda, Harris explained to a reporter that he and the other rioters were there to obstruct the certification of the Presidential election results. Harris remarked, "Until [former President Trump] gets his reelection, we will be here. Siege of the… Capitol Building." Once police officers began to clear Rotunda, Harris placed himself near the front of police lines, filming videos and taking pictures. In the scrum, he dropped his cell phone and pushed an officer back in order to retrieve it from the ground. Immediately after, he lambasted officers

with profanity, calling them "motherfuckers." Harris then refused multiple officers' commands to leave the Rotunda, arguing with officers that he needed to stay behind to collect his personal belongings, including his "speaker horn."

Late into the night of January 6, the same day he participated in the attack on the Capitol, Harris commented on Facebook: "We just got started… Even if we must give our lives to stop the awful takeover… We will not go away… We will prevail. We will not give up." Beginning that same day, and spanning for over a year, Harris waged a misinformation campaign on Facebook, falsely declaring that the January 6 riot was a "setup." Harris continued to engage in violent rhetoric after departing Washington, D.C., and returning to North Carolina.

The seriousness of this offense, including Harris's statements made online and in person prior to the events of January 6, his incitement of the mob on the Lower West Terrace and in the Rotunda with a megaphone, his passive and active resistance of police officers' efforts to clear the Rotunda, pushing a police officer, and his many public, threatening, and misleading statements made afterwards on social media, warrants a lengthy sentence of imprisonment.

### Harris' History and Characteristics

As set forth in the PSR, Harris, age 58, has a serious criminal history, beginning at age 16 and continuing to his mid-30's, including convictions for robbery, kidnapping, breaking and entering, theft, assault, escape from prison, resisting a public officer, disorderly conduct, and misdemeanor drug possession. PSR ¶¶ 41-59.  Harris has been sentenced to terms of incarceration on multiple occasions, some of which he served concurrently and some of which were suspended, so that Harris ultimately served two periods of incarceration, the longest of which was approximately 16 months. PSR ¶ 42-44. Harris' most recent criminal conviction was approximately 10 years ago for misdemeanor possession of marijuana. PSR ¶ 59. Harris's criminal

history includes an additional 53 arrests from age 17 to age 40 which did not result in conviction. PSR ¶ 69-121. Many of these are for traffic offenses (driving with a revoked license, driving without a license) but others include assault/fray, aggravated assault, assaulting a female (the mother of his children), armed robbery, breaking and entering, and possession of master keys and non-owner key sets. In addition to Harris' conduct on January 6 and his lack of remorse thereafter, his criminal history also supports a sentence of incarceration.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### C. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by Harris. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

*Specific Deterrence*

The Government's recommended sentence should also discourage Harris from engaging in such activity in the future.

Unlike other January 6 defendants who have expressed regret and remorse, during his first interview with the FBI, Harris told agents that he would do it all over again the same way and claimed his actions on January 6 were for the good of the country, even if that conduct resulted in a criminal charge. Harris likes to attend large events and he has shown the ability to travel great distances for experiences, including to restricted government properties like a U.S. Airforce facility in Nevada and the U.S. Capitol building. He also appears to like the notoriety that comes with participating in such events: during his participation in the Storm Area 51 event, he was interviewed and his interview went viral; on January 5, after crossing police lines and being rebuffed by police, he was interviewed by "Baked Alaska" (Gionet); on January 6, while participating in the riot inside the Capitol, he gave an interview to French media; after January 6, far from being ashamed about his criminal conduct, he had repeated contact with documentary filmmaker Alexandra Pelosi, and he appropriated a photo of himself from the government's Criminal Complaint and used it as his Facebook cover photo, bragging that he "wound up on the FBIs list of coolest looking, best dressed Crime fighters…." On January 6, Harris lined up as directed by the Proud Boys, while refusing to follow the lawful commands from multiple police

officers. After witnessing the attack on the Capitol, Harris was not deterred and, later that day, went so far as to comment on Facebook, "we must give our lives" to stop political rivals from governing. Harris spent over a year spreading misinformation on social media about his experiences on January 6 and soliciting interest in his videos from public figures. Even after entering a guilty plea for engaging in disorderly and disruptive conduct in the Capitol building, Harris gave conflicting statements to the FBI regarding whether he had been allowed to be inside. And Harris' criminal history, while dated, shows that his almost twenty years of extensive involvement with the criminal justice system did not deter him from taking part in a violent riot.

Given Harris' actions that day both inside and outside the U.S. Capitol building, and his lack of remorse, it is important that he be deterred and supervised.

### E.    The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] This Court must sentence Harris based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Harris has pleaded guilty to Count Two of the Information, charging him with Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2). This offense is a Class A misdemeanor. 18 U.S.C § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

As of the date of this sentencing memorandum, the government estimates that only 10 Capitol Riot defendants have been sentenced for a standalone violation of 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct, in the following cases: *United States v. Felipe Marquez*, 21-cr-136-RC, *United States v. Dennis Sidorski*, 21-cr-048-ABJ, *United States v. Matthew Baggott*, 21-cr-411-APM, *United States v. Benjamin Larocca*, 21-cr-317-TSC, *United States v. Glen Mitchell Simon*, 21-cr-346-BAH, *United States v. Stephen Ayres*, 21-cr-156-JDB, *United States v. Steven Billingsley*, 21-cr-519-TFH, *United States v. Katherine Schwab*, 21-cr-050-CRC, and *United States v. Eric Cramer*, 22-cr-339-RDM. This short list of Section 1752(a)(2) cases includes defendants who faced lower guideline ranges than Harris (because unlike Harris, they had no

physical contact with police), and/or who, unlike Harris, had no prior record of any kind.[9] This list

of Section 1752(a)(2) cases also includes cases with significantly different facts, e.g., *Ayres,* where

the defendant not only faced a significantly lower guideline range (0 to 6 months' incarceration),

but also demonstrated his true remorse in testifying before the House Select Committee to

Investigate the January 6th Attack on the Capitol and, as reported in the press, personally

apologizing to former Capitol Police Officer Aquilino Gonell and Washington Metropolitan Police

Officer Daniel Hodges, who were seated in the audience behind Ayres, as he left the hearing.

    This Court has sentenced one Capitol Riot defendant for a standalone violation of 18 U.S.C.

§ 1752(a)(2), Disorderly and Disruptive Conduct, in *United States v. Eric Cramer*, 22-cr-339-

RDM, imposing a sentence of 8 months of incarceration, 12 months of supervised release, 60 hours

community service, and $500 restitution. The facts in *Cramer* are similar those in the instant case.

Both Cramer and Harris dressed elaborately and brought multiple items with them to the riot.

Cramer brought a gas mask, a backpack, and a baseball bat. Harris brought multiple flags, a

megaphone, and a GoPro camera. On the previous night, Harris openly carried a knife around

downtown Washington, D.C. Both Cramer and Harris had physical encounters with police officers

on the front lines. Cramer caught a police officer's baton in his hand on the Lower West Terrace.

Harris pushed an officer in the Rotunda and actively resisted officers' efforts to remove him from

that area. Both Cramer and Harris bragged about their experience on social media afterwards;

Cramer posted an image of a police baton he took as a "trophy" while Harris posted a photo of

himself in the Capitol, which he took from the government's Statement of Facts in support of its

---

[9] Moreover, in one of the cases – *Marquez* – the government admittedly used the wrong Sentencing Guideline to calculate the offense level and so stipulated to an incorrect and significantly lesser base offense level. (The explanation of the government's error in *Marquez* is explained in the government's Supplemental Sentencing Memorandum in *United States v. Sidorski,* 21-cr-048-ABJ (Doc. 45, p. 5).)

Criminal Complaint, boasting "I… wound up on the FBIs list of coolest looking, best dressed Crime Fighters, (alias) Captain nobody, that's because I was the 420th arrest in the totally setup INSURFUCKIGRECTION!". However, Harris's conduct was more egregious than Cramer's. Harris made statements invoking calls for war on social media and in person on the night of January 5, posted images of the riot on social media in real time on January 6, and spread misinformation about the riot and shared images of it long after January 6. Additionally, Harris urged rioters outside the Capitol to "move forward" and incited rioters inside the Capitol by starting a call-and-response chant with his megaphone. Harris and Cramer both entered the Capitol building, but Harris went to more locations; Harris remained inside for approximately 45 minutes, while Cramer was inside for only about five minutes. These factors warrant a longer sentence for Harris than that imposed on Cramer.

Another useful case to consider is *United States v. Simon*, 21-cr-346-BAH, in which former Chief Judge Howell sentenced Simon to 8 months of incarceration, 12 months supervised release, a $1,000 fine, and $500 restitution). Harris was inside the Capitol approximately 44 minutes, while Simon was inside the Capitol building for approximately an hour; both traveled to about the same number of locations. Like Harris, Simon recorded video of the riot while outside on the grounds and while inside the building. Also, like Harris, Simon directed profanity towards police officers. Simon pushed against metal bike racks; Harris pushed an officer back in the Rotunda to retrieve his phone. Harris and Simon both actively resisted officers' efforts to clear the Rotunda of rioters. Simon sought to locate members of Congress, whereas Harris declined to follow rioters to the Speaker's office suite. Both Harris and Simon bragged about their participation in the riot afterwards on social media, but the scope and duration of Harris' online activities was greater. Simon told a reporter that he would go to Washington again, but denied entering the Capitol, and

lied to agents, telling them that he did not enter the Capitol, while Harris spoke to a reporter inside the Capitol during the riot and told agents he would do it all over again the same way, and that what he did was for the good of the country, even if it resulted in a criminal charge. Simon had a single 10-year-old conviction for disorderly conduct/fighting, while Harris has an extensive prior criminal record.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).[10] Generally, restitution under the VWPA must "be tied to the

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the

loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Harris must pay $500 in restitution, which reflects in part the role Harris played in the riot on January 6.[11] Plea Agreement at ¶¶ 10, 28, 172, 173. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Harris's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 172.

**VI.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient

---

crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

sentence. Balancing these factors, the government recommends that this Court sentence Harris to twelve months' incarceration, followed by one year of supervised release, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:    s/ *Will N. Widman*
       WILL N. WIDMAN
       Trial Attorney, Detailee

**CERTIFICATE OF SERVICE**

On this 17th day of May, 2023, a copy of the foregoing was served upon all parties

listed on the Electronic Case Filing (ECF) System.


               By:     s/ *Will N. Widman*
                          WILL N. WIDMAN
                          Trial Attorney, Detailee